HUNT, Appellant, v. DOLPHIN, Respondent.

(223 N. W. 64.)

(File No. 6457.   Opinion filed January 15, 1929.)

*O. A. Erdman,* of Denver, Colo., and *J. M. Armstrong,* of Belle Fourche, for Appellant.

*Dan McCutchen,* of Belle Fourche, for Respondent.

BROWN, J. In January, 1918, plaintiff, who was living in Colorado, E. R. Mills, of Boise, Idaho, and J. A. Dolphin, of Scotts Bluff, Neb., owned the S.½ of the N.E.¼ of section 29, township 8 north, range 6 east of the B. H. M., within the Belle Fourche irrigation project in Butte county, S. D. Plaintiff owned an undivided one-half and Mills and Dolphin each an undivided one-fourth; but legal title to the entire tract was in Mills. There was a mortgage on the land to J. T. Craig for $750.

On February 7th plaintiff wrote Mills that he was caught in the army draft and would not be able to give the land any attention, and that he would turn it over to Mills and Dolphin to take charge of the farming operations, and stated that anything they did would be satisfactory to him. He also asked if either Mills or Dolphin would give him $50 an acre for his interest. On March 8th he wrote Dolphin that he would have to "sluff" on duties of looking after the land, and said: "Whatever you do will be all right with me in every particular." On September 23d plaintiff was adjudged insane and committed to the hospital for the insane at Pueblo, Colo., and was not discharged until July 12, 1922.

The land was leased for the season of 1918, but in the fall of that year Mills and Dolphin, having difficulty in finding a renter for the ensuing year and taking plaintiff's letters as authority to act for him in the matter, entered into an agreement whereby Dolphin rented the premises for a term of five years from March 1, 1919, by the terms of which Dolphin agreed to advance money to construct certain buildings and make other improvements on the premises, title to which was to remain in him until three-fourths of the cost was repaid, after which the improvements were to be owned by the partners in the land, in proportion to their respective interests. The lease also contained other provisions in regard to the payment of government charges, taxes, and water users' association dues, and provided for a rental of $300 a year, $200 of which was to be considered as the amount going to plaintiff and $100 as the amount going to Mills. Dolphin had the option to terminate the lease at the end of any year. The lease also contained a provision that Dolphin might purchase the three-fourths interest of the others at the price and on the conditions named in an agreement of January 24, 1918, in which event the entire cost of the buildings and other permanent improvements should fall upon Dol-

phin and all rentals for the year in which the purchase was made should be deemed satisfied by the purchase.

The agreement of January 24, 1918, was in writing and headed "Partnership Agreement." It provided, in substance, that if any one of the parties desires to dispose of his interest, he shall give the others the first chance to buy it, and, in any event, the consent of all must be secured before any could transfer their interest to an outsider; that all expenses incident to carrying on the farming business, except interest on borrowed money, should be paid from receipts from the sale of crops or rent of the land, and, if such receipts were insufficient, the parties should pay their proportionate part of the deficit, and, if there was a surplus, it should be divided in proportion to the share of each in the land; that the mortgage on the land to J. T. Craig for $1,000 had been reduced to $750 by Mills paying his share; and that of the remaining $750 Hunt should assume $500 and Dolphin $250; that each party should have a one-third vote in the administration of the property; and that all parties consented to a sale of the land "at a price of $50 or more per acre, on terms of sale satisfactory to all concerned at any time within three years from the date hereof."

In January, 1920, Dolphin bought the three-fourths interest from Mills for $60 an acre, on the assumption that Mills as a member of the partnership, and on the authority of the letters and partnership agreement hereinbefore referred to, had a right to convey the three-fourths interest.

Plaintiff's discharge from the hospital for the insane was effected on a writ of habeas corpus, in which it was adjudged that he had never been insane, but was at all times compos mentis. While in the hospital he was allowed to write one letter a week to outsiders.

On May 8, 1920, Dolphin wrote and mailed a letter to plaintiff at Pueblo, Colo., in care of his sister, Miss Neva Hunt, in which he advised him of having purchased the interest of Mills and plaintiff in the land for $60 an acre, and inclosed a statement of the amount due plaintiff after deductions for his share of a mortgage on the premises and other expenses, which showed a net amount of $1,887.50 due plaintiff. This amount had been deposited in a trust fund drawing 5 per cent interest compounded quarterly. Later, on account of the numerous bank failures, Dolphin withdrew the

money from the bank and invested it in school and municipal bonds, which he held up to the time that this action was started against him. Plaintiff says that in July, 1920, he got a copy of this letter from his sister and that he then knew exactly what the deal was.

Dolphin paid Mills his share of the purchase price and paid off the Craig mortgage with accrued interest, and also paid out for improvements on the land an aggregate amount of $2,790.83, exclusive of his own work. He helped with the work on nearly all of the building and fencing. In order to raise the money for payment of these expenditures and the purchase price for the interest of plaintiff and Mills, he placed a mortgage of $4,000 on the land. Plaintiff made no objection to the sale to Dolphin nor to Dolphin's claim of ownership of the land until in March, 1925, shortly before the commencement of this action.

The trial court found that the total amount of the Craig mortgage, with taxes and water charges paid by defendant, aggregated $1,414.94; that the rental value of the land from 1919 to date of trial, inclusive, with interest at 7 per cent, is $1,016.40; that rentals collected by defendant for 1918 with interest to date of trial amounted to $454.92; that the total amount due from defendant to plaintiff on account of rentals was $1,471.32; that the actual cost of permanent improvements placed upon the land by defendant, exclusive of his own labor, was $2,893.82, one-half of which was approximately equivalent to the rental value of the land, $1,471.32; that the permanent improvements increased the value of the land approximately $3,000; and concluded as a matter of law that the one-half of the value of the permanent improvements was equal to all the rents due from defendant to plaintiff, with interest to the date of judgment, and that these items should be deemed each to set off the other; that defendant was entitled to recover plaintiff's share of the Craig mortgage, which was $509.89 on May 8, 1920, with interest on that sum at 8 per cent from May 8, 1920, and one-half of the money he had paid for taxes and water charges, with interest at 7 per cent from the date of such payments to the date of judgment, and that plaintiff was entitled to a decree vesting him with title to an undivided one-half of the premises; that as to the mortgage of $4,000 against the premises, plaintiff, being indebted to defendant on account of his share of the expenditures for taxes, water charges, and payment of his share of the Craig mortgage,

with interest on such items, in the aggregate amount of $1,414.94, should assume the payment of that much of the $4,000 mortgage, on which, at the date of the decree, there was due with interest $4,534.25; and that defendant should assume the balance of said mortgage, namely, $3,119.31. From a judgment pursuant to such findings and conclusions, and from an order denying a new trial, plaintiff appeals.

Enumeration of the items of expenditure made by defendant for improvements, water charges, taxes, and so forth, and of rents to be accounted for by defendant, in order to vindicate the soundness of the trial court's conclusions in these matters, would be profitless. It is sufficient to say that such conclusions are well sustained by the evidence.

The important questions involved are two: First, whether defendant is entitled to credit for value of permanent improvements and for plaintiff's share of the Craig mortgage paid by defendant; second, whether plaintiff is entitled to a money judgment for one-half the value of the land at the time defendant bought it in January, 1920. Plaintiff contends for a negative answer to the first and an affirmative answer to the second of these questions. We think he must fail in both contentions.

The trial court found that both defendant and Mills, at all times, in all that they did in regard to the land, acted in absolute good faith toward plaintiff, and sought to care for and protect his interests and rights at all times; that all improvements placed upon the land by defendant were made in good faith for the purpose of making the farm earn an income, and were very moderate in extent and character, and such as would ordinarily be required for the operation of a farm of that kind; that the improvements were beneficial to the farm and without them the farm would not have produced an income. There was ample evidence in support of these findings, and we certainly cannot say that the preponderance of the evidence is against them.

Rev. Code, § 2857, provides that in an action for the recovery of real property upon which permanent improvements have been made by a defendant or those under whom he claims, holding under color of title adversely to the claim of plaintiff, in good faith, the value of such improvements must be allowed as a counterclaim by

such defendant. Defendant's deed to the premises certainly con-
stituted color of title.

Plaintiff was advised of the transfer to defendant at least two
years before he commenced this action, and he had been discharged
from the hospital for the insane more than two years before he
commenced the action, and during all that time he had not repudi-
ated the transaction nor called in question the deed under which
defendant was claiming to own the land.

We think the court was clearly right in allowing the defendant
the value of the permanent improvements he had placed upon the
land and plaintiff's share of the Craig mortgage which had been
paid by defendant, with interest from the time of such payment,
as allowed by the court.

In regard to plaintiff's contention that he should have
been granted a money judgment against defendant for the value of
his interest in the land at the time it was conveyed to defendant, it
has to be said that this would be at variance with the entire theory
of plaintiff on the trial of the case. His complaint demands that
defendant be decreed to hold title to an undivided one-half interest
in the land in trust for plaintiff, and that defendant be directed to
convey to plaintiff said undivided one-half interest by a good and
sufficient deed; that plaintiff have judgment against defendant for
$328.65 for rent collected for the year 1918, with interest thereon
from February 4, 1919, to the date of judgment, and also the fur-
ther sum of $1,480 damages for being excluded from the enjoy-
ment of the premises; that an account be taken by the court as to
what sums, if any, are due from plaintiff to defendant under the
partnership agreement, and that all mutual claims and demands
may be adjusted and settled in this action. At no time while the
case was in the trial court did plaintiff ask for a money judgment
with any allowance to defendant for the permanent improvements
which he had placed upon the land. He presented objections in
writing to the proposed findings adopted by the court, but the only
thing in these objections indicating his desire for a money judg-
ment was a demand that plaintiff should have judgment for one-
half the purchase price for which the land was sold to defendant,
namely, $2,400, plus the amount of rents collected by defendant
prior to that time, with interest to the date of trial, less $398.47,
which he claimed represented the excess payments made by de-

fendant for taxes and water charges chargeable to plaintiff, and plaintiff's share of the liability on the Craig mortgage, over and above the rentals of plaintiff's share for the years 1919 to 1925, inclusive, all with legal interest added. In regard to this demand it may be observed in the first place that plaintiff demanded his share of the value of the land as it was after defendant had placed nearly $3,000 worth of permanent improvements upon it; that he demanded legal interest on this value down to the date of trial, and also demanded one-half of the rental value of the land from 1919 to 1925, inclusive.

It would clearly have been inequitable for the trial court to have given judgment in conformity with this demand, and the court, having found that the mortgage of $4,000 was placed upon the land by defendant in good faith, did the best it could to adjust the burden of that incumbrance as between plaintiff and defendant and give to plaintiff what he had demanded in his complaint, title to an undivided one-half interest in the land, with all mutual claims and demands settled in this action, as nearly in accordance with justice and right as could be done.

We think the judgment of the trial court is supported by the evidence in the case, and that it is not against the preponderance of the evidence. The judgment and order denying a new trial are affirmed.

SHERWOOD, P. J., and POLLEY, CAMPBELL, and BURCH, JJ., concur.